UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BRANDON B. DREWRY,         )
                                  )
         Plaintiff          )
                                  )
         v.               )       1:14-cv-00392-GZS
                                  )
CORRECT CARE SOLUTIONS, et al.,  )
                                  )
         Defendants      )

### RECOMMENDED DECISION ON DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff Brandon Drewry, currently an inmate at the Maine State Prison, alleges that Defendants acted with deliberate indifference toward his serious medical needs. More specifically, Plaintiff maintains Defendants did not respond appropriately to his need for treatment to reduce the frequency and intensity of nosebleeds resulting from hereditary hemorrhagic telangiectasia (HHT), and to his need for treatment to prevent or address Staphylococcus aureus infection.

The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 203). Through their motion, Defendants assert (1) that Plaintiff filed suit before exhausting available administrative remedies with respect to his HHT-related claim, and (2) that the factual record cannot support a deliberate indifference finding on any of Plaintiff's claims.

Following a review of the summary judgment record, and after consideration of the parties' arguments, I recommend the Court grant Defendants' Motion for Summary Judgment.

## I.   PROCEDURAL HISTORY

After Plaintiff filed this action on October 3, 2014, Defendants filed a motion to dismiss the complaint in which motion Defendants argued Plaintiff failed to state an actionable claim. (ECF No. 25.)[1]  The Court granted in part and denied in part the motion. (Recommended Decision, ECF No. 90; Order Affirming Recommended Decision, ECF No. 95.)  As the result of the Court's order, Plaintiff's complaint was limited to his deliberate indifference claims regarding the treatment of HHT and the staph infection.

On June 23, 2016, Plaintiff renewed his request for a stay of proceedings and filed a motion to supplement further the pleadings.  (ECF Nos. 155, 156.)  The Court granted in part the motion and authorized Plaintiff to join Defendants Webster and Cross-Snell without filing a comprehensive amended complaint.  (ECF No. 216.)  On July 25, 2016, Plaintiff again sought leave to supplement the pleadings.  (ECF No. 167.)  The Court granted Plaintiff's motion.  (ECF Nos. 214/215.)  Through the supplemental pleading, Plaintiff alleged Defendants denied him the use of a vaporizer (rather than a humidifier) to assist in the treatment of his conditions.

---

[1] Upon the filing of Defendants' motion to dismiss, Plaintiff filed six supplemental pleadings/motions to amend over the course of the next eight months. (ECF Nos. 27, 33, 44, 68, 73, 84.)  The Court repeatedly extended Plaintiff's deadline to respond to the motion to dismiss until July 27, 2015, though Plaintiff ultimately failed to file a memorandum of law in opposition to the motion to dismiss. Although Plaintiff failed to file an opposition memorandum, in addition to his motions to amend, supplement, and extend deadlines, Plaintiff filed a number of motions presenting multiple requests to stay proceedings, appoint counsel, and provide injunctive relief.  (ECF Nos. 26, 29, 41, 42, 48, 53, 55, 60, 75, 76.)  Plaintiff also filed an interlocutory appeal of the denial of his motion to appoint counsel.  (ECF No. 61.)

## II.   SUMMARY JUDGMENT RECORD

At summary judgment, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record.  Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence.  In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend.  A party seeking summary judgment thus must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement.  D. Me. Loc. R. 56(b).

A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c).  If an additional statement is introduced by the non-moving party, then the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence.   D. Me. Loc. R. 56(d).   "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  D. Me. Loc. R. 56(f).  Additionally, "[t]he court may disregard any statement of fact not supported by

a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules. *Ruiz Rivera v. Riley,* 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007). However, in the context of summary judgment, this Court has observed that a prisoner's nonconforming summary judgment submission should be reviewed by the Court and that the facts set forth in a verified complaint or prisoner affidavit should be considered. *Clarke v. Blais*, 473 F. Supp. 2d 124, 128 (D. Me. 2007). In this case, therefore, the summary judgment record consists of the Local Rule 56 record and Plaintiff's sworn statements of record.

### III.    BACKGROUND FACTS [2]

### A.    Exhustion of Administrative Remedies

At all relevant times, the Maine Department of Corrections maintained a grievance policy regarding medical care. (Defendants' Statement of Material Facts ("DSMF"), ¶¶ 106 – 110.) The policy establishes four steps in the grievance process:

---

[2] Defendants' fact statements concern two issues. The first issue is whether Plaintiff exhausted administrative proceedings before filing this action. The facts associated with the exhaustion issue were first set forth by Defendants in their statement of material facts (ECF No. 176, ¶¶ 27 – 40) filed in opposition to Plaintiff's motion for summary judgment, and are reasserted in Defendants' statement of material facts in support of their motion for summary judgment. (ECF No. 204, ¶¶ 105 – 113.) The second issue is whether a genuine issue of material fact exists for trial on Plaintiff's deliberate indifference claim. The facts associated with the deliberate indifference claim are found in Defendants' statement of material facts in support of their summary judgment motion. (ECF No. 204, ¶¶ 18 – 104.) Through his supplemental opposition (ECF No. 267), Plaintiff has responded to some, but not all of Defendants' factual statements.

(1) A preliminary stage in which the prisoner and the facility's Health Services Administrator, or her designee, attempt to resolve informally a claim concerning the denial of care, provided that the prisoner must first request the care in a sick call slip or similar request communicated to a prison provider, and provided that the prisoner must provide the administrator with the grievance form the prisoner proposes to file after the requested care is denied.  (Policy 29.02, Procedures A.2, B.1.)

(2) If the informal process does not achieve a resolution "for any reason," a first level of review, consisting of the filing of a grievance form with the Grievance Review Officer.  (*Id.*, Procedure C.1.)

(3) If the first level review is unsatisfactory to the prisoner "after receipt of the response," a second level of review, consisting of an appeal to the facility's Chief Administrative Officer.  (*Id.*, Procedure D.1.)

(4) If the second level review is unsatisfactory "after receipt of the response," a third level of review, consisting of an appeal to the Commissioner of the Department of Corrections.  (*Id.*, Procedure E.1.)

Plaintiff acknowledged that he received and reviewed a copy of the grievance process policy.  (DSMF ¶ 111.)  The only medical grievance for which Plaintiff complied fully with the grievance review process is his September 8, 2014, grievance regarding Defendants' alleged refusal to examine his staph sores.  (*Id.* ¶ 112; *see also* Response to Prisoner Grievance Third Level Appeal, Log # 14-Maine State Prison-213, ECF No. 176-7.)

Plaintiff also initiated a grievance proceeding based on the HHT and his nosebleeds. Through a grievance dated July 23, 2014, Plaintiff described an attempt to resolve informally a "chronic care" issue involving HHT and severe nosebleeds.  (ECF No. 176-6.)  In the grievance, Plaintiff wrote: "HSA Elisabeth Lamson … has failed to respond to the enclosed attempt to informally resolve the 'chronic care' issues, as described in the enclosed medical communication form …."  (*Id.*)  In the communication form, addressed

to Defendant Lamson, Plaintiff stated that he made "multiple attempts to informally resolve matters, including the matter of his nosebleeds," and wrote, "Herewith, I request that you resolve these issues." (ECF No. 162-7.)

The form, entitled "Medical – Prisoner Communication Form," begins with the following language:

> This form is to be used to explain an issue or concern or to ask a question about something that occurred within the past 3 days ONLY!! (for example, you didn't get your meds at the pill line, you didn't get your KOP, you would like to know the results of your tests, etc.)

(*Id.*)[3] Because the form submitted to HSA Lamson was the medical communication form and not the grievance form, the Grievance Review Officer dismissed the "complaint" as improper. (*Id.*) Specifically, he checked the box in the dismissal form that reads: "You did not attempt an informal resolution, as required by the Grievance Policy." (ECF No. 176-6.) On this point of procedure, Policy 29.02 specifically provides as follows:

> [B]efore filing any grievance form, a prisoner shall make an attempt to resolve the complaint in an informal manner by contacting, as soon as possible and no later than within five (5) days of the fifteen (15) day period, the facility's Health Service Administrator. *The prisoner shall provide to the Health Services Administrator, at the time of contact, the grievance form that the prisoner is proposing to file.*

(Policy 29.02, Procedure B.1 (emphasis added).)[4]

---

[3] Plaintiff has not responded to Defendants' factual statements related to Defendants' failure to exhaust administrative remedies argument. However, in support of his own motion for summary judgment, Plaintiff did file documents he evidently believed would demonstrate exhaustion. The exhaustion-related exhibits filed by Plaintiff in support of his summary judgment motion are the same exhibits filed by Defendants, with the one additional exhibit being the "medical communication form."

[4] Other documents in the record suggest Plaintiff initiated the grievance process on other occasions to address his concerns regarding the treatment of his HHT. Specifically, Plaintiff attached to his complaint two letters from HSA Lamson through which HSA Lamson responded to HHT-related grievance activity in May 2013 and January 2014 concerning the availability and frequency of the YAG procedures (a laser

**B.      Treatment for HTT and nosebleeds**

Plaintiff has hereditary hemorrhagic telangiectasia (HHT), a condition that causes him to experience frequent and severe nosebleeds.  HHT significantly impacts Plaintiff's quality of life because of the unpredictability and severity of the nosebleeds, the unpleasantness of the nosebleed experience, the frequent need to clean up blood, and because the condition has a negative impact on Plaintiff's ability to participate in prison activities and interact socially with other prisoners.  Plaintiff maintains that he should receive more frequent care from an outside provider, Dr. Julius Dixon, an ENT specialist, who has treated Plaintiff on four occasions by performing "YAG procedures" and has, according to Plaintiff, recommended two or three procedures annually.  (Complaint, PageID ## 11 – 12.)  The YAG procedure involves laser cauterization of nasal tissue to reduce the frequency of nosebleeds.  Plaintiff also maintains that he should have a vaporizer in his cell rather than a humidifier because the vaporizer is a more effective appliance and was recommended by Dr. Dixon.  (Motion to Supplement at 1, ECF No. 167.)  Plaintiff acknowledges that an ointment for his nasal passages is provided, but he asserts that it is not always available as needed because Defendants will not permit him to keep a tube of ointment on his person and instead require him to present at medical, where he receives a single application packet.  (Complaint, PageID # 19; Plaintiff's Opposition at 13 – 16, 25, ECF No. 267.)

---

surgery) to be provided by Dr. Damion, an outside provider.  (ECF No. 1-7.)  However, none of the documents suggests that Plaintiff exhausted the process.

Defendants have examined and treated Plaintiff regularly for his HHT and nosebleeds. (DSMF ¶ 27.) As part of that treatment, Defendants have facilitated Plaintiff's treatment with an outside consultant, Dr. Damion, M.D., an ENT specialist. (DSMF ¶¶ 28 – 31.) Dr. Damion performed four laser surgeries related to Plaintiff's condition (on June 18, 2013, September 5, 2013, March 19, 2014, and November 17, 2015), and Defendants anticipate facilitating further consultations with Dr. Damion as Plaintiff's medical needs require. (*Id*. ¶¶ 30, 44 – 45.) The decision as to whether Plaintiff should consult with Dr. Damion is made by Defendant Correct Care Solutions (CCS) and Dr. Damion, but Dr. Damion ultimately decides the frequency with which Plaintiff should have further laser procedures. (*Id*. ¶ 34.) Plaintiff has access to ointments on a daily basis to prevent dryness in his nasal passages, a saline mist to promote healing, has been provided a humidifier for his cell, has been prescribed an iron supplement to support him due to the blood loss, and has periodic blood work to monitor him for anemia. (*Id*. ¶¶ 36, 38 – 41.) In addition, Plaintiff was offered a more permanent treatment for his nosebleed condition, but after consulting with medical personnel, Plaintiff declined the offered treatment. (*Id*. ¶ 48.) [5]

## C.  Treatment for Staph Infection

Plaintiff alleges that he has experienced outbreaks of Staphylococcus aureus, which present as bleeding rashes or sores on his skin. In 2008 (several years before Defendants were responsible for his care), Plaintiff received a course of oral antibiotics in connection with sores that appeared on the back of his head and neck. (Complaint, PageID # 20.)

---

[5] Defendant Clinton, the Regional Medical Director for CCS (DSMF ¶ 10), has opined that the treatment Plaintiff has received is adequate "from a medical necessity standpoint." (*Id*. ¶ 50.) Plaintiff has not offered any expert medical testimony to support his claim.

Subsequently, Plaintiff was provided with skin lotion, which "solved the problem responsible for the 'staph infections'." (PageID # 21.) For approximately three years, Plaintiff had no further skin infections.

The record reflects that beginning in 2011, when CCS began as the contract provider at the Maine State Prison, CCS's medical personnel examined and treated Plaintiff frequently. Initially, CCS canceled Plaintiff's orders for, inter alia, Lubriskin lotion. (PageID ## 21 – 22.) Plaintiff was told to purchase the lotion from the canteen. (PageID # 22.) Plaintiff asserts that his condition is a chronic care matter and that skin lotion should be provided as a medication, without payment. (PageID ## 22 – 23.)

In August 2014, Plaintiff was seen by Defendant Webster, a doctor, for a severe nosebleed.[6] Plaintiff contends that at the time, he was experiencing an outbreak of staph infection, but Defendant Webster would not acknowledge or treat the alleged staph infection. (PageID ## 5 – 6.) Following that incident, Plaintiff has had fifteen or more infected sores, some of which ooze. (PageID ## 24 – 25.) Defendant Stockwell, another doctor by whom Plaintiff was seen for his condition, advised Plaintiff not to scratch his skin. (PageID # 30.)

On November 2, 2012, Plaintiff was seen in the clinic for complaints of dry skin. (DSMF ¶ 87.) The progress note reflects that Plaintiff's vital signs were taken, and upon Plaintiff's request, the attending nurse contacted Defendant Stockwell to inquire as to Plaintiff's "demand" for lotion. (*Id.* ¶ 88.) According to the note, when Plaintiff was

---

[6] Dana Webster, DO, is the Site Medical Director for CCS at the Maine State Prison. (DSMF ¶ 16.)

9

informed that lotion was available through the commissary, he threatened "to bring charges." (*Id.* ¶ 89.)  When Plaintiff was seen on November 12, 2012, he was started on a 180-day regimen of hydrocortisone ointment to be used daily to treat his symptoms for dry skin. [7] (*Id.* ¶¶ 91-92.)

On or about August 29, 2014, Plaintiff filed a grievance in which he asserted that Defendant Webster declined to examine staph sores on Plaintiff's body during a medical call on August 28 regarding one of Plaintiff's nosebleed incidents.  (Grievance, ECF No. 176-7.)   During Defendant Webster's examination of Plaintiff, Plaintiff informed Defendant that he "ha[d] a history of numerous staph skin infections" which he attributed to CCS medical staff no longer providing him with "Lubriderm for his dry skin." (DSMF ¶ 53.)  Plaintiff maintains Defendant Webster declined to assess or treat his sores during that particular sick call.[8]

CCS medical staff has provided Plaintiff with moisturizers and ointments in instances when it has been determined to be medically necessary.  (*Id.* ¶ 57.)  Plaintiff's recurrent skin ailments have not been designated as a "chronic care" condition, but instead have been treated as they arise and as needed.  (*Id.* ¶ 58.)  Even if the skin ailments were deemed to be a "chronic care" issue, the medical evidence does not support Plaintiff's

---

[7] In the medical opinion of Defendant Webster, it is reasonable and appropriate to order hydrocortisone topical ointment to treat dry skin, as it reduces symptoms of swelling, itching and redness associated with dry skin.  (*Id.* ¶ 86.)

[8] Defendant Webster contests Plaintiff's assertion, stating that at no time during that assessment did Defendant Webster observe what were believed to be "staph" sores, or other skin ailments requiring medical treatment. (DSMF ¶ 52.)  At the August 28, 2014, medical assessment of Plaintiff, Defendant Webster did observe some lower lip scarring and mild inflammation in the corners of Plaintiff's mouth, and ordered that Plaintiff be provided with Acyclovir topical ointment for treatment of his cold sores.  (*Id.* ¶ 61.)

contention that Lubriderm/Thermaderm would reduce the incidents of staph infection.  (*Id.* ¶ 59.)  Contrary to Plaintiff's belief, Lubriderm has not been shown to reduce the incidents of skin infections, including Staph aureus.  (*Id.* ¶ 54.)  CCS considers over-the-counter skin creams such as Lubriderm to be comfort items, and unless determined to be medically necessary, the medical department does not dispense comfort items as they are provided to the prison population through the commissary.  (*Id.* ¶ 55.)

Plaintiff next returned to the medical clinic on November 16, 2014.  (*Id.* ¶ 63.)  During the intervening period (from August 28 to November 16), Plaintiff did not submit any sick call slips to CCS medical staff concerning skin ailments or otherwise request treatment related to his skin.  (*Id.* ¶ 64.)

At the November 16, 2014, consult with a member of the CCS medical staff, Plaintiff was observed to have an open wound on the back of his left index finger.  (*Id.* ¶ 65.)  A culture was requested.  (*Id.* ¶ 66.)  On the same day, Plaintiff was started on Bactrim, which is an antibiotic used to treat bacterial infections, including Staph.  (*Id.* ¶ 67.)  The culture obtained from the left index finger tested positive for Staphylococcus aureus.  (*Id.* ¶ 68.)  On November 24, 2014, following an inquiry from Plaintiff as to whether Bactrim was the appropriate medication for his condition, Defendant Webster informed him that he was given the appropriate antibiotic.  (*Id.* ¶ 69.)

On December 29, 2014, Plaintiff submitted a sick call slip for sores on his hand and eye.  (*Id.* ¶ 70.)  The next day, he was seen twice by the CCS nursing staff and was started on Bactrim.  (*Id.* ¶ 71.)  In January and February 2015, Plaintiff was seen by medical staff

on three occasions for treatment for his nosebleeds, and one time for a follow-up "chronic care" evaluation, during which no sign of Staph was observed.  (*Id.* ¶ 72.)

During a February 10, 2015, assessment conducted in response to a nosebleed, a CCS medical provider observed a localized skin infection in Plaintiff's left armpit area, and he was once again started on antibiotics.  (*Id.* ¶ 73.)  According to the progress note, Plaintiff was advised to return to the clinic if the symptoms worsened or did not improve. (*Id.* ¶ 74.)  Approximately three months later, Plaintiff returned to the CCS medical clinic, and was treated with Bactrim antibiotics for a dollar sized boil on his left buttock.  (*Id.* ¶ 75.)

In June 2015, after submitting a sick call slip, Plaintiff was treated with Bactrim for a sore on the left side base of his neck and another on his thigh.  (*Id.* ¶ 76.)  The progress note documents that Plaintiff became confrontational with medical staff when he was informed that he would not be prescribed the Bactrim antibiotic "keep-on-person."  (*Id.* ¶ 77.)

Bactrim, as an antibiotic, generally does not qualify to be kept by members of the inmate population on a keep-on-person basis.  (*Id.* ¶ 78.)  The determination as to which prescriptions can be "kept-on-person" is a policy decision made by CCS, the Regional Medical Director, and the Maine Department of Corrections; it is not a decision made independently or on an ad hoc basis by CCS personnel, including the nurses.  (*Id.* ¶ 79.) For antibiotics, the medical staff directs the inmates to present to the pill window at the medical clinic so that the staff can monitor compliance of the antibiotic regimen.  (*Id.* ¶

81.)  Plaintiff routinely missed, refused, or declined to receive his Bactrim antibiotic.  (*Id.* ¶ 82.)[9]

## IV.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015).  If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied to the extent there are supported claims.  *Id.* at 77-78 ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party.") (internal quotation marks and alteration omitted).  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-

---

[9] Defendant Webster and Defendant Clinton have opined that the treatment Plaintiff has received has been appropriate and timely.  (*Id.* ¶¶ 96, 98.)  Plaintiff has not offered any expert medical testimony to support his claim.

24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . .").

## V.   DISCUSSION

### A.   Failure to Exhaust

Federal law requires a prisoner to exhaust the available administrative remedies before initiating a lawsuit based on 42 U.S.C. § 1983.  Specifically, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA [Prison Litigation Reform Act] and that unexhausted claims cannot be brought in court.")  "'Prison conditions' under [the PLRA] include individual instances of medical mis- or non-treatment."  *Acosta v. U.S. Marshals Serv.*, 445 F.2d 509, 512 (1st Cir. 2006).

The Supreme Court has held that § 1997e(a) requires "proper exhaustion" of a prisoner's administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id.* at 90 – 91.  "Compliance with prison grievance procedures … is all that is required … to 'properly exhaust.'"  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Id.*

A defendant may raise the § 1997e exhaustion requirement as an affirmative defense. *Jones*, 549 U.S. at 216; *see also Ramos v. Patnaude*, 640 F.3d 485, 488 (1st Cir. 2011) ("The Supreme Court made it plain … that exhaustion under § 1997e(a) is not a jurisdictional condition, and has held it to be an affirmative defense." (citing *Jones,* 549 U.S. at 212)). Because failure to exhaust administrative remedies is an affirmative defense rather than a jurisdictional issue, initially, Defendants bear the burden of proof. *Jones*, 549 U.S. at 216. To satisfy that burden, Defendants must establish "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino v. Baca,* 747 F.3d 1162, 1172 (9th Cir.) (en banc), *cert. denied sub nom.*, *Scott v. Albino*, 135 S. Ct. 403 (2014). Thereafter, Plaintiff must present evidence that demonstrates "that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

Defendants argue Plaintiff failed to exhaust available administrative remedies with respect to his claim of deliberate indifference in the care and treatment of HHT.[10] The undisputed record evidence establishes that Plaintiff attempted an informal resolution by sending a medical communication form to Defendant Lamson. The grievance policy, however, specifies that the informal grievance process begins with the presentation of a

---

[10] Defendants state that "all but one of Plaintiff's claims are barred as a result of his failure to exhaust the administrative remedies available through MSP prior to filing suit." (Motion at 13.) The one claim Defendants evidently consider to be exhausted is the claim concerning the treatment of staph sores. Because failure to exhaust is an affirmative defense, the concession that Plaintiff exhausted administrative remedies with respect to his Staph-related claim is accepted. Given that Plaintiff filed this action on October 3, 2014, and the Commissioner's response to what appears to be Plaintiff's final appeal is dated November 17, 2014, it appears that Plaintiff might have exhausted the administrative remedy soon after he commenced this action. (ECF No. 176-7, PageID # 1793.)

proposed grievance form.  Because Plaintiff did not follow the proper procedure, and because the record lacks evidence to suggest that he ever cured the failure to exhaust before filing this federal court action, Plaintiff cannot proceed in this Court on his HHT-related claim.  42 U.S.C. § 1997e(a) ("No action shall be brought … until such administrative remedies as are available are exhausted."); *Cano v. Taylor*, 739 F.3d 1214, 1219 (9th Cir. 2014) ("Congress purposefully made exhaustion a precondition to suit"); *Small v. Camden Cty.*, 728 F.3d 265, 269 (3d Cir. 2013) ("Under the PLRA, exhaustion is a precondition for bringing suit under § 1983."); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1141 (10th Cir. 2005) (explaining that a court should not adjudicate a prisoner's unexhausted claim);   *Perez v. Wisconsin Dep't of Corr.,* 182 F.3d 532, 534 (7th Cir. 1999) (same); *Brown v. Toombs,* 139 F.3d 1102, 1104 (6th Cir. 1998) (same); *see also Wilkinson v. Dotson*, 544 U.S. 74, 84 (2005) (noting the congressional "requirement that prisoners exhaust state administrative remedies as a precondition to any § 1983 action"); *Booth v. Churner*, 532 U.S. 731, 741 (2001) ("Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures."); *Ruppert v. Aragon*, 448 F. App'x 862, 863 (10th Cir. 2012) ("Since the PLRA makes exhaustion a precondition to *filing* a suit, an action brought before administrative remedies are exhausted must be dismissed without regard to concern for judicial efficiency.").[11]

---

[11] Plaintiff's most recently-asserted claim, regarding the Defendants' failure to provide a vaporizer, is subsumed within Plaintiff's more general claim that Defendants acted with deliberate indifference to Plaintiff's need for treatment for HHT.

### B.    Deliberate Indifference

The Due Process Clause imposes on the states the "substantive obligation" not to treat prisoners in their care in a manner that reflects "deliberate indifference" toward "a substantial risk of serious harm to health," *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011), or "serious medical needs," *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 161 (1st Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 – 106 (1976)).  To be actionable, a deliberate indifference claim must satisfy both an objective and a subjective standard.  *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011).

The objective standard evaluates the seriousness of the risk of harm to one's health. For a medical condition to be objectively "serious," there must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'"  *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).  A medical need is serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention.  *Leavitt*, 645 F.3d at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991)).

The subjective standard concerns the culpability of the defendant.  There must be evidence that a particular defendant possessed a culpable state of mind amounting to "deliberate indifference to an inmate's health or safety."  *Farmer*, 511 U.S. at 834 (internal quotation marks omitted).  Deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable."  *Feeney*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)).  The focus of the

deliberate indifference analysis "is on what the jailers knew and what they did in response."

*Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002).

Deliberate indifference must be distinguished from negligence.  As the First Circuit

explained:

> A finding of deliberate indifference requires more than a showing of negligence.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).  A plaintiff claiming an eighth amendment violation with respect to an inmate's serious mental health or safety needs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference."  *Estelle*, 429 U.S. at 106; *see also Cortes-Quinone v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988).  Although this court has hesitated to find deliberate indifference to a serious need "[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment," *Sires*, 834 F.2d at 13, deliberate indifference may be found where the attention received is "so clearly inadequate as to amount to a refusal to provide essential care."  *Miranda v. Munoz,* 770 F.2d 255, 259 (1st Cir. 1985) (quotations omitted).

*Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991).

The summary judgment record establishes that Defendants did not act with

deliberate indifference in the treatment of Plaintiff's skin condition and infection. While

Plaintiff disagrees with Defendants' judgment as to the appropriate treatment, the record

does not support a finding that any of the care rendered by any of the defendants was "so

clearly inadequate as to amount to a refusal to provide essential care."  *Id.*  Instead, the

record reveals that Plaintiff received regular and responsive care.  The record establishes

that Defendants have examined Plaintiff regularly and prescribed moisturizers, ointments

and antibiotics when medically necessary.

Similarly, even if Plaintiff is deemed to have exhausted his grievance regarding the treatment of his HTT and nosebleeds, Plaintiff cannot prevail on a deliberate indifference claim based on Defendants' treatment.  Defendants have treated Plaintiff regularly for the conditions, and have facilitated Plaintiff's treatment with an outside consultant, Julius Damion, M.D., an ENT specialist. In fact, Dr. Damion performed four laser surgeries related to Plaintiff's condition (on June 18, 2013, September 5, 2013, March 19, 2014, and November 17, 2015).  In addition, further treatment with Dr. Damion, with whom CCS confers, is available as the need arises.  Dr. Damion, not any of the defendants, determines the frequency with which Plaintiff requires the laser procedure.  Furthermore, Plaintiff has had a saline mist to promote healing, has been provided a humidifier, has been prescribed an iron supplement to support him due to the blood loss and has periodic blood work to monitor him for anemia.  In short, under the circumstances, Defendants' treatment of Plaintiff's HHT and nosebleeds has not been "so clearly inadequate as to amount to a refusal to provide essential care."  *Torraco*, 923 F.2d at 234.

## VI.   CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendants' Motion for Summary Judgment (ECF No. 203), and enter judgment for Defendants.[12]

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. Section 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within

---

[12] If the Court concludes an issue of fact remains as to Plaintiff's deliberate indifference claim based on the treatment of his HHT and nosebleeds, but determines that Plaintiff has failed to exhaust the administrative remedies regarding the claim, the appropriate disposition would likely be to dismiss the claim.

fourteen (14) days of being served with a copy.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.  Fed. R. Civ. P. 72(b)(2).

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 21st day of March, 2017.